UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>MAKSIM STEFANYUK,<br><br>Defendant. | 4:17-CR-40042-KES<br><br>REPORT AND RECOMMENDATION |

## INTRODUCTION

Defendant Maksim Stefanyuk is before the court on an indictment charging him with receipt and distribution of child pornography and with failure to register as a sex offender. See Docket No. 1. Mr. Stefanyuk has filed a motion to suppress certain evidence. See Docket No. 45. The United States ("government") resists the motion. See Docket No. 51. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, district judge.

## FACTS

An evidentiary hearing was held on June 14, 2018. Mr. Stefanyuk was there in person along with his lawyer, Jason Tupman. The government was

represented by its Assistant United States Attorney, Jeffrey Clapper. Two witnesses testified and five exhibits were received into evidence. From this testimony and these exhibits, the court makes the following findings of fact.

Special Agent Charla Aramayo of the Department of Homeland Security received a referral on January 20, 2017, from a state police officer on the Internet Crimes Against Children Task Force. The officer forwarded to Agent Aramayo a disc containing his reports and evidence showing a person at a specified Internet Protocol ("IP") address was downloading child pornography. The street address the IP address was linked to was identified as a home in Sioux Falls. This same home had been Mr. Stefanyuk's home address at the time of a prior federal prosecution. Furthermore, the Internet Service Provider listed Mr. Stefanyuk as the customer for the suspect IP address. Finally, Mr. Stefanyuk had listed this same address in paperwork on file with his employer.

Agent Aramayo's office was approximately one mile from the suspected Stefanyuk home. During the investigation, Agent Aramayo would frequently drive past the subject home on her way to work and on her way home. On January 24, 2017, Agent Aramayo wrote down the license plate numbers of three vehicles at the subject home and later researched who were the registered owners of those vehicles. Agent Aramayo described the housing area as a residential "pocket" and stated people would likely not be found driving in the neighborhood unless their destination was one of the houses in the neighborhood. Agent Aramayo felt that physical surveillance was impractical

because her presence would have been of note in the lightly-traveled neighborhood. The roads in this neighborhood had no curb and gutter and there were no sidewalks.

On February 8, 2017, Agent Aramayo applied for and received from the South Dakota Division of Criminal Investigation (DCI) a pole camera to aid her investigation. The main purpose she requested the camera was in order to verify that Mr. Stefanyuk was living at the subject house. The DCI mounted the disguised camera in an area approximately 15 feet off the ground in a right-of-way directly opposite the subject home.

DCI Special Agent Chad Carpenter testified to the camera's capabilities. The camera had approximately a 30-degree view and could pan slightly from side to side, tilt slightly up and down, zoom in up to 30x, and was high definition up to 1080 pixels. Footage from the camera could be viewed on a mobile device, on the internet, or through software installed on a computer. The image on the camera was somewhat grainy due to the camouflage that disguised the camera. The camera had limited ability to show images at night depending on the ambient lighting around the camera. This was, in turn, affected by factors such as whether there was a full moon, whether it was cloudy, and how many streetlights and other sources of light were nearby.

The camera in question ran continuously for two weeks from February 8 to 22, 2017. The footage could be viewed live, or recorded footage could be reviewed with rewind and fast forward capabilities. Although the video footage

3

was saved, it is no longer available due to a system upgrade by the DCI. After this upgrade, Agent Carpenter could no longer access the video footage.

The subject home was in a suburban part of Sioux Falls. The subject home was on a corner with a street running along its northern perimeter and another street running along its west perimeter. Another house sat directly across the street from the subject home, facing the subject house. The front door, garage, and driveway of the subject home were all in clear and open view from the house across the street to the west. Another house sat immediately to the south of the subject house.

Agent Aramayo accessed the video feed from the camera remotely via a laptop computer. A few times she watched footage live; approximately twice she reviewed previously-recorded footage. She testified she obtained Mr. Stefanyuk's work schedule and then reviewed footage from the camera from February 9 and 10 to see if Mr. Stefanyuk could be seen coming and going from the subject home at the approximate times he had to go to work and got off from work. Agent Aramayo described viewing a person who matched the general description of Mr. Stefanyuk drive into the driveway of the subject house and enter the house shortly after Mr. Stefanyuk's work schedule indicated he had just gotten off work. The image was recorded at approximately 5:30 a.m. (Mr. Stefanyuk had worked the night shift), which at that time of the year was still several hours before sunrise. It was, therefore, dark.

Another time, viewing live footage from the camera, Agent Aramayo observed a fourth vehicle parked at the subject home that she had not previously seen.  She got in her own vehicle and physically drove to the subject house to obtain further description of this new vehicle.  Upon arriving at the house, she viewed Mr. Stefanyuk with her own eyes in the yard along with another young man she assumed to be Mr. Stefanyuk's brother.

Agent Aramayo believed Mr. Stefanyuk was driving a Nissan vehicle.  Armed with his work schedule, she drove by the house sometime between February 15 and 19 and observed the Nissan was gone from the house.  She then went to Mr. Stefanyuk's place of employment and observed the Nissan parked in the employer's parking lot.

Agent Aramayo described the view from the camera as showing only the front of the house as in Government's Exhibit 1, but more of an angle from the north instead of head-on.  She stated she could not see into the house or on either side of the house.  If the garage door was up, she testified you could see a little ways into the garage.

The pole camera ceased filming on February 22, 2017.  Agent Aramayo subsequently applied for a search warrant for the subject home and vehicles located there.

Mr. Stefanyuk now moves to suppress the evidence from the pole camera, arguing that it was a warrantless search prohibited by the Fourth Amendment.  The government responded with three arguments:  (1) no warrant was required by the Fourth Amendment for the pole camera; (2) if the pole

camera did violate Mr. Stefanyuk's rights, the subsequent search warrant provided probable cause for the search of Mr. Stefanyuk's home even if the evidence from the pole camera is excised from the search warrant application; and (3) if the search warrant was not supported by probable cause, the fruits of the search should still be admissible pursuant to the Leon[1] good faith exception to the exclusionary rule.  See Docket No. 52.

In response, in oral argument before this court at the evidentiary hearing, Mr. Stefanyuk conceded the government's second and third arguments.  To clarify, Mr. Stefanyuk only seeks to suppress the fact of the existence of the pole camera, any testimony or evidence as to views from the pole camera, and to suppress identification of the fourth motor vehicle observed initially via the camera at Mr. Stefanyuk's residence.  Accordingly, the court addresses only the issue of whether the pole camera required Agent Aramayo to obtain a search warrant before installation of that device.

## DISCUSSION

### A. The Government Has the Burden of Proof

Where a warrantless search occurs, the burden is on the government to show by a preponderance of the evidence that an exception to the warrant requirement applies.  Coolidge v. New Hampshire, 403 U.S. 443 (1971); United States v. Kennedy, 427 F.3d 1136, 1140 (8th Cir. 2005).  Because no search warrant supported the installation of the pole camera, the court places the

---

[1] United States v. Leon, 468 U.S. 897 (1984).

burden on the government to show that the pole camera complied with the dictates of the Fourth Amendment.

**B.    Was a Search Warrant Required for the Pole Camera?**

The parties agree there is no binding precedent from the Eighth Circuit on the necessity of obtaining a search warrant prior to using a pole camera for surveillance.  Therefore, the court's decision is guided by general Fourth Amendment principles and persuasive authority from other jurisdictions.

**1.    <u>United States v. Jones</u>**

The Fourth Amendment provides protection for people from unreasonable searches and seizures.  <u>See</u> U.S. CONST. Art. IV.  The amendment's purpose "reflects its close connection to property," and, thus, "Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century."  <u>United States v. Jones</u>, 565 U.S. 400, 405 (2012).

But that trespass concept evolved as technology changed.  For example, in 1928, the Court held wiretaps attached to telephone wires on the public streets were not a "search" within the purview of the Fourth Amendment because "[t]here was no entry of the houses or offices of the defendants."  <u>Id.</u> at 405 (quoting <u>Olmstead v. United States</u>, 277 U.S. 438 (1928) overruled in part by <u>Katz v. United States</u>, 389 U.S. 347 (1967)).  Forty years later, in a departure from property-based analysis, the Court held an eavesdropping device on a public telephone booth violated the Fourth Amendment because it

7

violated a person's "reasonable expectation of privacy." Jones, 565 U.S. at 405-06 (quoting Katz, 389 U.S. at 351, 360).

In the Jones case, the government sought to uphold the use of a GPS tracking device attached to the bottom of Jones' vehicle by arguing that Jones had no "reasonable expectation of privacy" in the undercarriage of his car or the public places the car traveled in and to. Jones, 565 U.S. at 406. The government emphasized that when Jones' vehicle was on the public roads, his presence was "visible to all." Id.

Justice Scalia, writing for five of the nine justices, asserted that the "reasonable expectation of privacy" standard did not displace the earlier trespass standard, but "added to" it. Id. at 406-08. Here, because there was an uncontroverted trespass by police onto Jones' vehicle, there was a "search" within the meaning of the Fourth Amendment. Id. Justice Scalia pointed out that the Court's holding was not a deviation from its holding in prior cases "that mere visual observation does not constitute a search." Id. at 412 (citing Kyllo v. United States, 533 U.S. 27, 31-32 (2001)). Thus, the Court held a person travelling through public areas has no reasonable expectation of privacy and, if police had conducted surveillance of Jones through traditional surveillance without a trespass, it may very well have passed constitutional muster. Id. The Court also hinted that achieving the same result through the use of electronic means—without a trespass—may **not** pass constitutional muster. Id. But the Court declined to address that situation since the case before it *did* involve trespass. Id.

Justice Sotomayer concurred in the majority opinion, but wrote separately to emphasize that, in addition to trespass, a search occurs where the suspect has "a subjective expectation of privacy that society recognizes as reasonable." Id. at 414 (citing Kyllo, 533 U.S. at 33) (Sotomayer, J., concurring). She agreed with Justice Alito's concurring opinion that, "at the very least, 'longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy.'" Id. at 415 (quoting Alito, J, concurring opinion at 427-29). She also wrote that traditional police surveillance abuses are checked by "limited police resources and community hostility," which, because of their surreptitious and inexpensive nature, electronic surveillance methods evade. Id. at 416 (quoting Illinois v. Lidster, 540 U.S. 419, 426 (2004)).

Justice Alito wrote a separate opinion concurring in the judgment and three other Justices joined his opinion. Id. at 418. The thrust of Justice Alito's opinion was that the Kyllo reasonable expectations of privacy test should apply because the trespass model--"18th-century tort law" according to Justice Alito--was ill-equipped to address "21st-century" electronic surveillance. Id. at 418-19. In his view, the reasonable expectation of privacy test completely eclipsed the former trespass test and should be the exclusive test applied. Id. at 422.

Under that test, Justice Alito found the attachment of the GPS device to Jones' vehicle unconstitutional, in large part due to the long-term nature of the surveillance (4 weeks) and the continuous nature of the surveillance. Id. at

9

431.  He noted that technology changes rapidly, and that may lead to changes in the public's expectations of privacy—it may make people *more* protective of their privacy, or they may find the trade-off between the advantages of the new technology and the infringement on their privacy to be acceptable or inevitable, thus *lowering* expectations of privacy.  Id. at 427.

In Jones, a majority of the Court agreed that both the traditional trespass model and the reasonable expectation of privacy test were applicable to Fourth Amendment challenges.  Here, the testimony at the evidentiary hearing established that no trespass occurred.  The pole camera did not touch in any way Mr. Stefanyuk's property.  It was installed on property across the street from Mr. Stefanyuk's home in a public right of way.  If there is a Fourth Amendment violation in Mr. Stefanyuk's case, therefore, it must be premised on a violation of a reasonable expectation of privacy.

### 2. Reasonable Expectation of Privacy Test

The government in this case, as it did in the Jones case, asserts that everything the camera saw outside Mr. Stefanyuk's home took place in view of the public.  Anyone who passed by would have been able to see what the camera recorded.  Accordingly, the government argues even if Mr. Stefanyuk had a subjective expectation of privacy, it was not one that society recognizes as a reasonable expectation.

The government cites cases which apply this analysis to pole cameras and have held no constitutional infringement took place.  See United States v. Houston, 813 F.3d 282, 288-90 (6th Cir. 2016); United States v. Jackson, 213

10

F.3d 1269, 1280 (10th Cir. 2000), vacated on other grounds, 531 U.S. 1033 (2000).  However, with all due respect, this analysis appears too facile.  It fails to recognize that a pole camera in a very real sense enhances police officers' senses—it can zoom in and pan, it can stay awake and alert for 24 hours a day without respite, it costs next to nothing, and it allows data to be stored indefinitely, to be replayed again and again in the future, allowing mining of ever-more-detailed information.

Mr. Stefanyuk cites State v. Jones, 903 N.W.2d 101 (S.D. 2017), in support of his argument that the use of the pole camera in his case violated the Fourth Amendment.  In Jones, the state installed a warrantless pole camera on a public street light and recorded defendant's activities outside his home for two months, later using the information gained from the camera to apply for and receive a search warrant for defendant's home.  Jones, 903 N.W.2d at 103-04.  In that case, the defendant conceded that individual, discrete events in public view outside his home were not protected by the Fourth Amendment. Id. at 110.  But, he argued, he had a subjective expectation of privacy in *the whole of his movements* and to be free from 24/7 targeted, long-term observation of his and his guests' coming and going from his home.  Id.  The court agreed.  Id. at 111.  The court also held this expectation of privacy was one society recognized as reasonable.  Id. at 112-13.  Thus, the court held police in that case were required to obtain a search warrant before installing the pole camera.  Id.

Mr. Stefanyuk also cites to United States v. Vargas, CR-13-6025-EFS, Docket No. 106 (E.D. Wash. Dec. 15, 2014) (unpub'd), in support of his motion to suppress. The court in that case found a pole camera violated the Fourth Amendment's prohibition on unreasonable searches. Id. at *29. The facts of the case were important to the court's holding.

In Vargas, police mounted a pole camera which was focused on the defendant's house for six weeks. Id. at *5. The silent feed from the camera was recorded on a police detective's computer 20 miles away. Id. The detective could remotely view the footage, view recorded footage after the fact, could take still "photographs" from the video, and could rotate and zoom the video camera's view. Id. at **5-6. The camera was mounted on a utility pole at an elevation higher than the defendant's home. Id. The camera allowed viewing of anything in defendant's front yard, front door, an open parking structure, vehicles (including inside vehicles if doors or trunk lids were open), people and the surrounding area. Id. Although the camera had the ability to see inside defendant's house if a door were open or a window was unobstructed, there was no evidence the police in fact used the camera to access such views. Id. The camera operated 24 hours a day and continued for 6 continuous weeks except certain unexplained "jumps" in time on the video. Id. The camera did not have night vision or infrared/heat-sensing capabilities. Id.

The defendant's house was in a very rural area off a gravel road on which few vehicles traveled. Id. at **2-4. It was surrounded by undeveloped property covered in sagebrush and other native plants. Id. Defendant had erected a

gate across his driveway along with a wire cyclone fence and a 20-foot strip of natural vegetation which separated defendant's front yard from the gravel road in front.  Id.  No other structures were visible from defendant's front yard.  Id.

On May 2, the detective saw defendant apparently engaged in target practice with a pistol in his front yard.  Id. at *6.  On May 6, the detective viewed defendant and two other males socializing, drinking beer, and engaging in target practice in defendant's front yard.  Id. at **6-7.  The detective was able to zoom in and identify a silver semi-automatic pistol of unknown caliber and a rifle being used by the men.  Id. at *7.  The detective also saw one of the men urinating at the side of the front yard near the cyclone fence 15 feet from the gravel road running in front of the house, "presumably confident that he would not be observed."  Id.  After a 45-minute jump in the May 6 recording, the film showed two other vehicles and two other men had arrived.  Id.  The men continued socializing, but no longer engaged in target practice.  Id.  The driver of one of the vehicles went into the house and did not socialize with the others outside.  Id.  Eventually, the two new men left in a single vehicle and the 3 original men resume their target practice and later enjoyed a bonfire in a burn barrel.  Id. at **7-8.

Because of prior contacts with law enforcement, the detective believed the defendant was an alien who was residing in the United States illegally.  Id. at *8.  The detective confirmed defendants' immigration status and then applied for a search warrant to look for evidence of violations of 18 U.S.C. § 922(g)(5), being an alien in possession of a firearm.  Id.  The search warrant

13

was issued by a federal magistrate judge.  Id.  The search was conducted on May 16 and turned up four firearms as well as baggies containing methamphetamine.  Id.  The court seemed to find it significant that police trained the view of the camera away from the house toward an empty field while they executed the search warrant and then trained the camera back on defendant's house after the search was over.  Id. at **8-9.  Defendant argued that the pole camera violated his Fourth Amendment right to be free from unreasonable searches.

The court interpreted United States v. Jones, 565 U.S. 400 (2012), to provide two separate avenues for determining whether an unreasonable search in violation of the Fourth Amendment had occurred.  Vargas, at *12.  First, an [unlicensed] trespass by law enforcement can give rise to an unreasonable search.  Id.  Second, the court held an unreasonable search can also arise from violation of a reasonable expectation of privacy.  Id.  Because law enforcement's pole camera did not impinge on any physical property belonging to defendant, the court focused on the second type of analysis.  Id.

Applying this analysis, the court concluded that defendant had an actual subjective expectation of privacy and that "society expects that law enforcement's continuous and covert video observation and recording of an individual's front yard must be judicially approved"—i.e. required a search warrant.  Id. at *13.  In so concluding, the court distinguished this case from those cases relying on the "plain view" doctrine.  Id. at **17-18.  Here, there was no real-time eyewitness observations by live police officers; rather what

14

police were able to view was the result of "electronic, continuous remote surveillance" over the course of six weeks.  Id.  The court held it would not grant suppression if the evidence had been obtained by old-fashioned surveillance by undercover officers.  Id. at **19-20.  However, continuous remote electronic surveillance, which the court termed "one of the most intrusive investigative mechanisms available to law enforcement," was distinguishable.  Id.  Such investigative methods "provoke an immediate negative visceral reaction" and "raise the specter of the Orwellian state."  Id. at *21.

The court distinguished its holding also based on the nature of defendant's home.  Id. at *24.  Defendant chose to live in a rural, isolated area, in a partially enclosed space, with no nearby neighbors, and off a gravel road over which passersby were few and far between.  Id.  Due to the nature of the setting, defendant could hear a vehicle approaching for some time before it arrived at his house and could modify his behavior in the interim.  Id.  Other cases approving pole camera surveillance involved homes that were under observation in urban settings where the suspects' expectation of privacy while in their front yards or on their curtilage was very much reduced.  Id. at **25-26.

The court first states the obvious:  an unpublished decision by a district court judge in the Ninth Circuit is not binding authority on this court, nor is a decision by the South Dakota Supreme Court on an issue of federal constitutional law.  Having said this, the court finds the analysis in Vargas and

15

State v. Jones to be sound and well-supported factually and legally. But just as the district court in Vargas distinguished its case from those decisions by other courts involving different residential settings, so too must this court distinguish the Vargas holding from the facts of Mr. Stefanyuk's case.

The home Mr. Stefanyuk was living in was in a suburban setting, not a rural one as in Vargas. There were many houses in close proximity to Mr. Stefanyuk's, and city streets running by two sides of the house with traffic coming and going from the neighborhood. One house sat facing the front of Mr. Stefanyuk's house directly across the street with an unimpeded view of the Stefanyuk front yard, garage and front door. Another house sat immediately to the south of Mr. Stefanyuk's house. Unlike the defendant in Vargas, who could step outside his home and legitimately expect not to be viewed by anyone, literally every time Mr. Stefanyuk exited his home, he had to expect a passerby or neighbor might view him. The setting was less congested and occupied than perhaps other neighborhoods in Sioux Falls, but it was definitely of a suburban character as opposed to the isolated rural character of Vargas' home.

In addition, the court notes that the Vargas opinion was written four years ago—an eternity when it comes to technology. Perhaps at that time, the idea that one might expect to be constantly under surveillance whenever one is out in public could be considered "Orwellian." However, as Justice Alito noted in his concurrence in Jones, technology is always changing and with it, our expectations of privacy. And it is not always predictable which way public conceptions of privacy will swing. There have been a number of high profile

cases well covered in the media where crimes have been solved because of the pervasive nature of video surveillance, public and private.

For example, when a bomb exploded at the finish line of the Boston Marathon, the perpetrators were identified because nearly every inch of downtown Boston is covered by surveillance cameras, public and private. Nor is that phenomenon limited to huge urban centers. In our own town of Sioux Falls, South Dakota, where Mr. Stefanyuk lives, a drug-rip-off-turned-vehicular-homicide approximately 18 months ago was solved by patching together surveillance footage from disparate locations along the road where the parties had driven their vehicles. Furthermore, it is increasingly popular and affordable for private homeowners to have their own video surveillance systems at home. The idea that you can step outside your door and not be filmed by someone or another is no longer an unassailable assumption.

As for the decision in State v. Jones, the surveillance in that case took place over two continuous months, as contrasted with two weeks in Mr. Stefanyuk's case. Furthermore, in Mr. Stefanyuk's case, the investigation was not wholly based on evidence from the pole camera as in State v. Jones. Instead, important and consequential evidence was garnered by Agent Aramayo the old fashioned way: with shoe leather and her own ingenuity. She contacted Mr. Stefanyuk's employer to obtain his work schedule, she wrote down license plates numbers of cars she viewed in person in the driveway, she verified the location of the car she suspected Mr. Stefanyuk of driving to make sure it coincided with what she knew his employment movements would be,

and she personally saw Mr. Stefanyuk in the front yard of the subject house with her own unaided eyes. None of this data came from the pole camera. All of the evidence in State v. Jones, and Vargas derived from a camera.

But the court finds the decisions in Vargas and State v. Jones distinguishable for a very important reason neither party has discussed which bears heavily on the reasonable expectation of privacy inquiry: at the time the pole camera was mounted, Mr. Stefanyuk was on federal supervised release in connection with a prior federal prosecution. Therefore, his legitimate expectation of privacy was less than the then-private citizens in State v. Jones and Vargas.

The Eighth Circuit has recently described federal supervised release as "more severe punishment than parole and probation" and stated that a federal supervisee has "the most circumscribed expectation of privacy." United States v. Jackson, 866 F.3d 982, 985 (8th Cir. 2017). The court in Jackson held a defendant on federal supervised release had *no* expectation of privacy in his cell phone that society would recognize as legitimate. Id. The court distinguished Jackson's situation from the defendant in Riley v. California, 573 U.S. ___, 134 S. Ct. 2473 (2014), where the Supreme Court held a search warrant is generally required to search a cell phone. Jackson, 866 F.3d at 986. The defendant in Riley was an arrestee, whereas the defendant in Jackson was on supervised release. Id. The diminished expectation of privacy accorded to Jackson did not apply equally to one who is a mere arrestee and who is still presumed innocent. Id.

18

Here, during the period from February 8-22, 2017, Mr. Stefanyuk was on federal supervised release.  See <u>United States v. Stefanyuk</u>, CR 11-40098 (D.S.D.).  He was sentenced on January 9, 2014, to a two-year term of imprisonment with five years of supervised release to follow.  <u>Id.</u> at Docket No. 79.  His term of supervised release began on April 4, 2016.  <u>Id.</u> at Docket No. 85.  Therefore, he was 10 months into his five-year term of supervised release at the time the pole camera data was obtained.

Even if Mr. Stefanyuk had a subjective expectation of privacy in his comings and goings from his home over the two-week period during which he was subject to electronic surveillance, that expectation is not one society is willing to recognize as legitimate given Mr. Stefanyuk's status as a federal supervisee.  <u>Jackson</u>, 866 F.3d at 986.  Accordingly, the court recommends Mr. Stefanyuk's motion to suppress be denied.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends that defendant Maksim Stefanyuk's motion to suppress [Docket No. 45] be denied.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this report and recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact.  Objections must be timely and specific in order to require de novo review by the

district court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED June 15, 2018.

BY THE COURT:

_____
VERONICA L. DUFFY
United States Magistrate Judge